**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

AMEGY BANK NATIONAL
ASSOCIATION,

        Plaintiff,

vs.                                  Case No. 2:12-cv-243-UA-SPC

DEUTSCHE BANK CORPORATION, DB
PRIVATE WEALTH MORTGAGE LTD.,
and DEUTSCHE BANK ALEX.BROWN,

        Defendants.

---

### ORDER

    This cause is before the Court on Defendants' Motion to Dismiss and Incorporated Memorandum of Law ("Defendants' Motion"), filed on October 23, 2012 (Doc. No. 31), Plaintiff's Response, filed on November 06, 2012 (Doc. No. 32), and Defendants' Reply in Support of their Motion to Dismiss ("Defendants' Reply"), filed on December 10, 2012.  (Doc. No. 35.)  After a careful review of the parties' submissions and the applicable law, the Court finds the Motion due to be **GRANTED** in part and **DENIED** in part**.**

### BACKGROUND

    Plaintiff, Amegy Bank National Association ("Amegy") seeks relief from the unlawful conversion of its security interest held in the partnership stock of a hotel.  (Doc. No. 30, pp. 9-10.)  In early 2008, Amegy loaned William B. Johnson ("Johnson") and his single member limited liability company, Monarch Flight II, LLC ("Monarch Flight") Fifteen Million Dollars to purchase a 1983 Gulfstream Jet, to complete a development project in the Bahamas, known as Orchid Bay, and for other purposes.  (Id., p. 2.)

Johnson executed a Promissory Note obligating Monarch Flight to pay Amegy the loan amount plus interest in monthly payments by May 1, 2011.  (Id., p. 3.)  As collateral for the loan, Johnson assigned and granted to Amegy a security interest in 825,457 units of partnership interest in Host Hotels & Resorts, L.P., any shares of the Host Hotels & Resorts, Inc. owned by Johnson as a result of the redemption or exchange of the partnership units, and all products and proceeds from the partnership units and/or related stock ("Hotel Stock" or "Hotel Proceeds").  (Id., p. 4.)  The Security Agreement with Amegy forbade Johnson from selling, assigning, conveying, pledging, or otherwise disposing of the partnership units or the related stock without the prior written consent of Amegy.  (Id.)  Upon an "Event of Default" as defined in the Promissory Note, the Security Agreement granted Amegy all rights and remedies of a secured party under the Uniform Commercial Code ("U.C.C."), including the ability to collect, receive, or take possession of the partnership units and related stock.  (Id.)  On May 7, 2008, Amegy filed a UCC-1 Financing Statement perfecting its security interest in Johnson's partnership units and related stock.  (Id., pp. 4-5.)

In October 2008, Monarch Flight defaulted on the loan.  (Id., p. 5.)  On December 10, 2009, Amegy sent a letter demanding that Monarch Flight and Johnson repay fifty percent of the loan by December 31, 2009.  (Id., p. 5.)  In response, Johnson's attorney, John T. Bobo confirmed that Johnson retained and continued to pledge the 825,457 partnership units to Amegy.  (Id., p. 6.)  However, on January 5, 2010, Johnson redeemed his interest in the partnership units and liquidated the stock in violation of the Security Agreement.  (Id.)  Johnson then deposited the proceeds of the stock into an account opened with Defendant Alex.Brown, a division of Deutsche Bank Securities (collectively "DBS").  (Id.)  As a prerequisite to opening the account with Alex.Brown,

Johnson was required to grant to DBS and all its affiliates a security interest in all securities and other property in Johnson's possession. (Id.)

Despite pledging the stock proceeds to Amegy and without Amegy's knowledge, Johnson paid at least $98,177.25 of the funds to Defendant, DB Private Wealth Mortgage ("PWM") on a mortgage loan made on a real estate property, known as Spyglass. (Id.) In addition, Johnson paid $407,394.04 to non-party contractors to make improvements on the Spyglass property and an additional $81,849.39 to the Collier County Tax Collector to discharge tax obligations on the property. (Id., p. 8.) PWM holds a first-priority security interest and lien on the Spyglass property, which is otherwise unrelated to the Amegy transaction. (Doc. No. 31, p. 2.)[1]

Amegy maintains that DBS and PWM are working in concert with each other to convert its secured collateral in the Hotel stocks. (Doc. No. 30, p. 6.) On October 23, 2012, Defendants moved to dismiss. (Doc. No. 31.)

## APPLICABLE STANDARDS

In deciding a Rule 12(b)(6) motion to dismiss, the Court must accept all well pleaded factual allegations in a complaint as true and take them in the light most favorable to plaintiff. Erickson v. Pardus, 551 U.S. 89, 94 (2007); Bingham v. Thomas, 654 F.3d 1171, 1175 (11th Cir. 2011). "To survive dismissal, the complaint's allegations

---

[1]On August 30, 2011, Amegy filed a lawsuit against Johnson in federal court in Houston, where the district court held that Johnson defrauded Amegy by liquidating the Hotel stock proceeds in violation of the Security Agreement. (Doc. No. 30, pp. 7-8.) The Second Amended Complaint asserts that the district court imposed a constructive trust on certain realty, including the Spyglass Property. (Id., p. 8.) Defendants challenge that assertion, citing to an exhibit that shows that the Texas court excluded the Spyglass property from the judgment against Johnson. (Doc. No. 31, p. 2.) See Universal Express, Inc. v. U.S. S.E.C., 177 Fed. App'x 52, 53 (11th Cir. 2006) (A district court may take judicial notice of certain facts, including public records, without converting a motion to dismiss into a motion for summary judgment.).

must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level; if they do not, the plaintiff's complaint should be dismissed." James River Ins. Co. v. Ground Down Eng'g, Inc., 540 F.3d 1270, 1274 (11th Cir. 2008) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)); see also Edwards v. Prime, Inc., 602 F.3d 1276, 1291 (11th Cir. 2010).  Therefore, courts must follow a two-step approach when considering a motion to dismiss: first, "eliminate any allegations in the complaint that are merely legal conclusions;" and second, "where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'"  Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009)).  The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me-accusation."  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

## DISCUSSION

### A.  Multiple Claims Combined into Count I

Prior to addressing the merits of Defendants' Motion, the Court must resolve Defendants' procedural argument (Doc. No. 31, p. 7) that Amegy has impermissibly combined two claims into one count – one for equitable subrogation and one for declaratory relief.  Federal Rule of Civil Procedure 10(b) requires parties to limit claims "as far as practicable to a single set of circumstances," and to state in a separate count or defense "each claim founded on a separate transaction or occurrence . . . ."  The separation of claims, however, is required by Rule 10(b) "only when necessary to facilitate a clear presentation."  5A FED. PRAC. & PROC. CIV. § 1324 (3d ed.).  Here, Count IV requests a declaratory judgment that Amegy is entitled to equitable

subrogation to the collateral proceeds.  The declaratory judgment claim is inextricably tied to the equitable subrogation claim and the two claims relate to a single set of circumstances.  Moreover, Defendants have drafted their Motion to Dismiss without indicating any prejudice or confusion over Amegy's allegations.  The Court rejects Defendants' Motion to Dismiss on these grounds.

### B. Equitable Subrogation

Pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201, Amegy seeks a declaratory judgment to be equitably subrogated to: (a) all of PWM's rights and remedies as a lien holder on the Spyglass property "by virtue of Defendants' receipt of the partnership assets and their benefit therefrom;" and (b) Collier County's rights and remedies as first-priority lien holder for the funds used to satisfy the tax obligations on the Spyglass property.  (Doc. No. 30, p. 9.)  The Court will address each argument in turn.

    1.  <u>Subrogation to PWM's Lien</u>

Amegy argues that it is entitled to be subrogated to PWM's lien on the Spyglass Property in the amount of $587,420.68.  (Doc. No. 30, p. 9.)  Defendants assert that Amegy has failed to state a viable claim for equitable subrogation.  Defendants are correct.

Florida courts recognize two forms of subrogation: conventional and equitable subrogation.  Conventional subrogation stems from a contractual obligation that the party paying the debt will be provided with the rights and remedies of the creditor whose debt has been paid.  <u>Boley v. Daniel</u>, 72 Fla. 121, 123 (Fla. 1916).  In contrast, equitable subrogation (also known as legal subrogation) derives from the legal consequences of the parties' acts and relationships, not from a statute or a contract.

Dade Cnty. Sch. Bd. v. Radio Station WQBA, 731 So. 2d 638, 646 (Fla. 1999).  As an equitable remedy, Florida courts broadly apply the principle "in almost every conceivable type of transaction where the party invoking the doctrine has been required to pay a debt for which another is primarily answerable . . . ." Rebozo v. Royal Indem. Co., 369 So. 2d 644, 646 (Fla. Dist. Ct. App. 1979); see also Picker Fin. Group L.L.C. v. Horizon Bank, 293 B.R. 253, 259 (M.D. Fla. 2003).

To assert an equitable subrogation claim, the subrogee must establish that: (1) it made a payment to pay off a debt; (2) it did not act as a volunteer; (3) it was not primarily liable for the debt; (4) the subrogee paid off the entire debt of the subrogor; and (5) subrogation would not work any injustice to the rights of a third party.  Dade Cnty. Sch. Bd., 731 So. 2d at 646.[2]  When properly invoked, equitable subrogation permits "the person discharging the debt [to] stand in the shoes of the person whose claim has been discharged, thereby succeeding to the rights and priorities of the original creditor." Id., at 646 (quoting E. Nat'l Bank v. Glendale Fed. Sav. & Loan Ass'n, 508 So. 2d 1323, 1324 (Fla. Dist. Ct. App. 1987)).

In the instant case, Amegy must but has failed to plead that its funds were used to pay off the entire mortgage owed to PWM on the Spyglass property.  Instead, Defendants allege and Plaintiff does not dispute that only a portion of PWM's mortgage was paid using the collateral proceeds.  See Defendants' Motion, p. 4.

_____

[2]Defendants argue (Doc. No. 31, p. 9) that an equitable subrogation claim requires the party seeking the relief to show it has obtained a release for the other party responsible for the debt.  Defendants' Motion, p. 9 (citing Abercrombie & Fitch Stores, Inc. v. Texas Fixture Installers, No. 3:09-cv-860-J-TEM, 2011 WL 1258559, at *3 (M.D. Fla. Mar. 31, 2011)).  However, Florida courts, including the Eleventh Circuit have not consistently applied this requirement.  Instead, the more critical inquiry is whether the subrogee has completely paid off the debt to another.  See, e.g., Nova Info. Sys., Inc. v. Greenwich Ins. Co., 365 F.3d 996, 1005 (11th Cir. 2004); Cont'l Cas. Co. v. Ryan Inc. E., 974 So. 2d 368, 380 (Fla. 2008).

Amegy argues that there is no established test or general rule for invoking equitable subrogation because its application depends on the facts and circumstances of each case, "having for its basis the doing of complete and perfect justice between the parties without regard to form." Dantzler Lumber & Exp. Co. v. Columbia Cas. Co., 156 So. 116, 119 (Fla. 1934).  Amegy maintains that Dade Cnty. Sch. Bd. is inapplicable because "it was decided in the context of a personal injury claim . . . ."  Plaintiff's Response, p. 7.  Amegy's arguments are unavailing.

In spite of the doctrine's broad application, Florida courts and the Eleventh Circuit consistently have held that equitable subrogation is appropriate only when the five aforementioned elements are satisfied.  See, e.g., Nova Info. Sys., Inc., 365 F.3d at 1005; Cont'l Cas. Co., 974 So. 2d at 380.  Dade Cnty. Sch. Bd., in particular, is often cited for the proposition that the doctrine extends to parties who completely discharge debts owed to another.  See, e.g., Great Am. Ins. Co. v. Sch. Bd. of Broward Cnty., Fla., No. 09-61636-CIV, 2010 WL 4366865, at *6 (S.D. Fla. July 30, 2010).  As the Fifth Circuit explained, "[t]he rationale behind the rule is that equitable subrogation should not prejudice the senior lienholder's attempt to collect the entire indebtedness secured by the senior lien." Dietrich Indus. Inc. v. United States, 988 F.2d 568, 572 (5th Cir. 1993). Accordingly, permitting Amegy to subrogate to the rights and lien status of PWM prejudices PWM's ability to collect on the remaining mortgage debt owed by Johnson. For these reasons, Amegy's equitable subrogation claim involving the proceeds used to pay off the mortgage payments on Spyglass is dismissed.

2.   Subrogation to Collier County's First Priority Lien

Amegy asserts subrogation to Collier County's first priority lien because its funds were used to pay the tax obligations on the Spyglass property.  In contrast to its claim

concerning the mortgage payments, Amegy has pled facts demonstrating each element of equitable subrogation with respect to the tax obligations on Spyglass.

Amegy has alleged that $81,849.39 of proceeds from its secured collateral was used to extinguish the tax obligations on the Spyglass property.  (Doc. No. 30, p. 8.) The tax payments were involuntarily made to Collier County since Johnson misappropriated Amegy's funds to pay off the tax obligation in violation of the Security Agreement.  (Id., p. 6.)  Amegy was not primarily responsible for the delinquent taxes. Unlike PWM's mortgage, the tax obligations were purportedly paid in full.  (Id.)  Finally, permitting Amegy to subrogate itself in place of the superior lien held by Collier County would not work any injustice on another party.  As Amegy asserts, if Johnson had not discharged the tax obligations on Spyglass using Amegy's funds, Collier County would have maintained a superior lien against the property in the amount of the unpaid taxes. Plaintiff's Response, p. 9.  PWM, in turn, would have been in the same position if Johnson had not misappropriated the funds and would have had to pay off the taxes on the property before it could recover on its own lien.

A similar conclusion was reached in Radison Prop., Inc. v. Flamingo Groves Inc., 767 So. 2d 587 (Fla. Dist. Ct. App. 2000), which contrary to Defendants' arguments, supports Amegy's subrogation claims.  In Radison, the court subrogated the Defendants, the Greenwalds in the shoes of the Broward County Tax Collector since a portion of their funds were used to pay delinquent real estate taxes.  Id. at 591-92. Plaintiff, Ahmad Nader, the sole shareholder of Radison Properties discovered that the property was illegally conveyed by its former president to Flamingo Groves, Inc., which subsequently mortgaged the property to the Greenwalds for $150,000.  Id. at 589. Flamingo used a portion of the Greenwalds' mortgage loan to satisfy unpaid taxes and

liens on the property. Id. Despite invalidating the mortgage to Flamingo Groves and the subsequent mortgage to the Greenwalds, the court nonetheless awarded the Greenwalds an equitable lien equal to the amount of taxes paid to the County.[3] Id. at 591. The court reasoned that plaintiffs "[were] not entitled to a windfall by having their delinquent real estate taxes paid from the proceeds of the loan from the Greenwalds to Flamingo." See also Palm Beach Sav. & Loan Ass'n, F.S.A. v. Fishbein, 619 So. 2d 267, 270-71 (Fla. 1993) (the bank was awarded an equitable lien in the amount of its funds used to satisfy unpaid taxes on the property); First NLC Fin. Serv., LLC v. Altamirano, 847 So. 2d 516 (Fla. Dist. Ct. App. 2003) (plaintiff entitled to an equitable lien because its funds were used to satisfy the property tax lien); Benchmark Bank v. Crowder, 919 S.W. 2d 657, 663 (Tex. 1996) ("Bank was properly subrogated to the federal government's tax liens" because its loan proceeds were used to pay off the tax debts and even though the Texas Constitution did not recognize the validity of the federal tax lien).

Similarly here, Amegy alleges that PWM is not entitled to an $81,849.39 windfall by having the delinquent real estate taxes paid from the proceeds of its loan to Johnson. Defendants distinguish Radison on the basis that the court found an equitable lien only after determining that there was no other adequate remedy at law. Defendants' Reply, p. 3. However, the touchstone of the Radison holding and of the equitable subrogation remedy in general is to ensure that "no one shall be enriched by another's loss." Picker, 293 B.R. at 259 (quoting Fed. Land Bank of Columbia v. Godwin, 107 Fla. 537, 549 (Fla. 1933)); Radison, 767 So. 2d at 592. Here, PWM would be unjustly enriched by

---

[3]Defendants mistakenly assert that the Radison court granted an equitable lien to Flamingo Groves. Defendants' Reply, p. 3.

having Amegy's funds used to pay off the tax obligations on Spyglass.  Contrary to Defendants' assertion, the focus is not on whether Johnson benefits from the taxes paid from the proceeds of Amegy's loan.  The issue is whether PWM enjoys a windfall by having a superior tax lien paid off using another party's proceeds.

Defendants also argue that Amegy should have asserted a claim against Collier County since Defendants never received the portion of the collateral proceeds used to pay off the tax obligations.  Defendants' Motion, p. 16.  However, Defendants' possession of these funds is irrelevant to their potential benefit from the satisfaction of a superior tax lien.  Moreover, courts frequently impose equitable liens when a party's funds were used to pay off property taxes even if a claim was not brought against the tax collecting authority.  See, e.g., First NLC Fin. Servs., 847 So. 2d 516 (Fla. Dist. Ct. App. 2003); Fishbein, 619 So. 2d at 270.

For these reasons, Defendants' Motion to Dismiss is denied with respect to Amegy's equitable subrogation claims concerning the proceeds used to pay off the tax liens on the Spyglass property.

### C. Conversion

Amegy alleges that Defendants unlawfully converted its collateral when Johnson transferred the stock proceeds into the Alex.Brown bank account and used the funds to make payments associated with Spyglass.

Under Florida law, the tort of conversion is defined as an (1) act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with an ownership therein.  Tambourine Comercio Int'l SA v. Solowsky, 312 Fed. App'x 263, 271-72 (11th Cir. 2009).  "The generally accepted rule is that demand and refusal [by the rightful property owner] are unnecessary where the act complained of amounts to a conversion

. . . ." Id. at 272 (quoting Goodrich v. Malowney, 157 So. 2d 829, 832 (Fla. Dist. Ct. App. 1963)).

Amegy's conversion claims complain of three acts: (1) DBS (including its affiliate Alex.Brown) colluded with PWM to convert the stock proceeds by permitting Johnson to deposit the funds into an Alex.Brown bank account; (2) as part of the conspiracy, Johnson paid PWM at least $98,177.25 to pay off a portion of the mortgage held by PWM on the Spyglass property; and (3) Johnson disbursed an additional $407,394.04 in proceeds to third party contractors to make improvements on Spyglass and $81,849.39 to Collier County to discharge tax obligations on the property.

For clarity's sake, the Court will divide and consecutively address the conversion claims against PWM and DBS.

1.    Conversion Claim against PWM

Amegy alleges (Doc. No. 30, p. 8) that PWM unlawfully converted its collateral when Johnson used at least $98,177.25 of collateral proceeds to pay off interest payments on the Spyglass mortgage.  PWM argues that Amegy has failed to show that it has a right to possess the collateral proceeds.  The Court disagrees with PWM.

Defendants first assert that when a conversion claim concerns money, as is the case here, the money must be "deposited into an account designed to keep the money segregated and identifiable . . . or where there is an obligation or fiduciary duty to keep the money segregated."  Battle v. Wachovia Bank, N.A., No. 10-21782, 2011 WL 1085579, at *2 (S.D. Fla. Mar. 21, 2011).  "Money is capable of identification where it is delivered at one time, by one act and in one mass, or where the deposit is special and the identical money is to be kept for the party making the deposit . . . ."  Solowsky, 312 Fed. App'x at 272 (quoting Belford Trucking v. Zagar, 243 So. 2d 646, 648 (Fla. Dist. Ct.

App. 1970)).  This identification requirement ensures that money actually exists to pay off a specific debt and the claimant is not merely trying to enforce a contract dispute by a conversion claim.  Solowsky, 312 Fed. App'x at 272.[4]

Amegy maintains that only the proceeds from the Hotel stock were deposited into the bank accounts.  Plaintiff's Response, p. 17.  Accordingly, it appears that the funds, including the portions used to pay the tax, mortgage, and property improvement payments on the Spyglass property were deposited at once, segregated, and capable of being traced back to the proceeds that arose from the liquidation of the Hotel stocks.

Defendants remaining arguments concern the perfection and priority of security interests and the disposition of collateral proceeds, governed by Florida law and Article 9 of the Uniform Commercial Code.  Under the U.C.C., a security interest in collateral attaches to any "identifiable proceeds" of collateral upon its sale or distribution.  See U.C.C. § 9-315(a)(2); Fla. Stat. § 679.3151(1).[5]  Relying on this provision, Amegy

---

[4]The Eleventh Circuit previously explained that this "specific fund requirement is an exception to the general rule that an obligation to pay money cannot be enforced through an action for conversion," and is therefore inapplicable to tort conversion claims.  (internal quotation marks omitted).  Bel-Bel Intern. Corp. v. Comm'ty Bank of Homestead, 162 F.3d 1101, 1109 (11th Cir. 1998).  Instead, the principle applies when "an action in tort is inappropriate [and] where the claim is based on a breach of contract."  Id. at 1109.  In Solowsky, 312 Fed. App'x at 272-73, however, the Eleventh Circuit applied this identification requirement to a tort conversion claim.  Regardless, as explained below, the Court finds that Amegy has established, for the purposes of this motion, that the collateral proceeds were segregated and identifiable.

[5]A perfected security interest in collateral proceeds continues for only twenty days after the disposition of the collateral. Fla. Stat. § 679.3151(4).  Fla. Stat. § 679.3151(4) provides three different scenarios where a creditor may retain its interest in the collateral proceeds beyond the twenty days:

(1)    A filed financing statement covers the original collateral; the proceeds are collateral in which a security interest may be perfected by filing in the office in which the financing statement has been filed; and the proceeds are not acquired with cash proceeds;

(2)    The proceeds are identifiable cash proceeds; or

argues that the Eleventh Circuit has recognized its right to bring a conversion claim when collateral has been disposed of or transferred to another party.   Plaintiff's Response, pp. 15-16 (citing to Taylor Rental Corp. v. J.I. Case Co., 749 F.2d 1526, 1529 (11th Cir. 1985) (quoting Fla. Stat. § 679.3151, cmt. 2, which provides that a secured party may "repossess the collateral from the transferee or, in an appropriate case, maintain an action for conversion . . . .")).

However, under U.C.C. § 9-332, codified at Fla. Stat. § 679.332, an innocent transferee of money or funds from a deposit account takes the money or the funds free of any security interest unless the transferee acts in collusion with the debtor in violating the rights of the secured party.   The policy behind affording "broad protections" to innocent transferees of funds or money from a deposit account derives from the high value placed on the finality of transactions, the need to minimize the likelihood that a secured party will enjoy a claim to whatever the transferee purchases with the funds, and the fact that the U.C.C. disfavors "the opportunity to upset a completed transaction,

(3)   The security interest in the proceeds is perfected other than under subsection (3) when the security interest attaches to the proceeds or within 20 days thereafter

The parties dispute whether the first of the three exceptions to the rule governing the expiration of automatic perfection was satisfied here. Defendants' Reply brief (Doc. No. 35, p. 6) argues, for the first time, that Amegy's security interest in the collateral proceeds does not continue beyond the twenty days because "the proceeds that Amegy seeks to trace were, by Amegy's own allegations, acquired with cash proceeds . . . ." Defendants' lone conclusory statement is insufficient to establish a basis for dismissal. Presumably, Defendants argue that Johnson converted the Hotel stocks into cash, used to "acquire" a separate "proceed", the Spyglass property.  However, it is unclear whether the Spyglass property was "acquired" since a portion of the cash proceeds were used to simply pay off monthly interest payments on the Spyglass mortgage and to discharge a tax lien on the property.  Without additional information and for the purposes of this Motion, the Court will conclude that Amegy's security interest in the partnership stock continued beyond the twenty days.

or even to place a completed transaction in jeopardy by bringing suit against the transferee of funds . . . ." U.C.C. § 9-332, cmt. 2.  As one court explained, "despite valid concerns for the secured creditor, an interest in ensuring the free flow of funds and in ensuring the finality of a completed transaction, trumps the interests of a secured creditor."  Keybank Nat. Ass'n v. Ruiz Food Prods., Inc., No. CV 04-296-MHW, 2005 WL 2218441, at *5 (D. Idaho Sept. 9, 2005).

The Eleventh Circuit recently discussed the broad protections afforded by § 9-332 in In re Delco Oil, Inc., 599 F.3d 1255 (11th Cir. 2010).  There, the debtor, Delco Oil, Inc. entered into an agreement with CapitalSource, in which CapitalSource agreed to finance Delco Oil's purchase of petroleum products in exchange for a security interest in Delco Oil's property, collections, cash payments, and inventory.  Id. at 1257.  A few months later, Delco Oil filed for Chapter 11 bankruptcy and paid over $1.9 million to a third party, Marathon.  Id.  In determining whether CapitalSource retained a security interest in the cash proceeds, the court acknowledged that under § 9-332, "CapitalSource did not have a security interest in the funds after Debtor [Delco Oil] transferred them to Marathon."  Id. at 1260.  Nevertheless, the court held that under the relevant Bankruptcy code, Delco Oil had no authority to transfer the cash collateral to a Marathon and that prior to the transfer, CapitalSource had a security interest in Delco Oil's deposit account funds as proceeds of its secured collateral.  Id.  As the court explained, the funds could be recovered from Marathon "not because CapitalSource continued to have a security interest in the funds once they were in the hands of Marathon, but because Debtor was not authorized to transfer the funds to anyone post-petition . . . ."  Id.

Likewise here, Defendants maintain that absent a showing of collusion, Amegy

no longer has the right to possess the collateral proceeds because the Hotel stock was converted into cash, deposited into the bank accounts, and used to make payments associated with Spyglass.   Defendants' Motion, p. 12 ("Amegy can establish a continued security interest in the . . . funds . . . only if it can demonstrate collusion between . . . PWM and Johnson.").

Amegy alleges three separate disbursements of the collateral proceeds: first at least $98,177.25 was paid to PWM to pay off monthly interest payments on the Spyglass mortgage; second $407,394.04 was paid to contractors for improvements on the property; and finally $81,849.39 was provided to Collier County to extinguish tax obligations.  Under § 9-332, Amegy's security interest in the collateral proceeds was lost as soon as the disbursements were made to PWM, Collier County, and the contractors. Unlike In re Delco Oil, Inc., the bankruptcy code does not govern this dispute and will not act to invalidate the transfer of funds.

Amegy responds that § 9-332 is inapplicable for two reasons.   Amegy's arguments concern the two subsections to § 9-332, which provide that:

> (1) A transferee of money takes the money free of a security interest unless the transferee acts in collusion with the debtor in violating the rights of the secured party.

> (2) A transferee of funds from a deposit account takes the funds free of a security interest in the deposit account unless the transferee acts in collusion with the debtor in violating the rights of the secured party.

First, Amegy argues that subsection (1) of § 9-332 applies to the transfer of "money" to a third party, not the transfer of funds by a check, as is the case here. Plaintiff's Response, p. 13 (citing to Ag Venture, Fin. Servs, Inc. v. Montagne (In re Montagne), 418 B.R. 809, 814 (Bankr. D. Vt. 2009)).   While that may be the case,

Defendants rely (see Doc. No. 31, pp. 11-12) on subsection (2) to deny Amegy a security interest in the collateral proceeds, which applies when a transfer of funds is made "by check, by funds transfer, or by debiting the debtor's deposit account . . . ." U.C.C. § 9-332(2), cmt. 2.

Second, Amegy cites to Madisonville State Bank v. Cantebury, Stuber, Edler, Gooch & Suratt, P.C., 209 S.W. 3d 254, 258 (Tex. App. 2006) to argue that Subsection (2) is inapplicable because it protects transferees of funds only when a secured party holds a security interest in the deposit account itself, not the monies in the account. Here, Amegy's conversion claim concerns its security interest in the cash proceeds held in bank accounts, not the accounts themselves. However, this Court finds as City Bank v. Compass Bank, 717 F. Supp. 2d 599, 616-17 (W.D. Tex. 2010) did that Madisonville State Bank's distinction between an encumbered bank account and encumbered funds in the account is "unsound" and contrary to the "explicit statement of legislative intent" to § 9-332. In fact, Official Comment 2 of § 9-332 expressly rejects Amegy's distinction, noting that subsection (2) applies to "transfers of funds from a deposit account . . . not to the creation of a security interest in a deposit account." Instead, "[c]ompeting claims to the deposit account itself are dealt with by other Article 9 priority rules." Id.

Next, Amegy argues that under In re Montagne, 413 B.R. 148 (Bankr. D. Vt. 2009), the requisite showing of collusion under § 9-332 is an affirmative defense on which PWM has the burden of proof. However, In re Montagne implied the opposite when noting that § 9-332 "presents a substantial burden on parties seeking to prove conversion claims involving money." 413 B.R. at 159; see also Gen. Elec. Capital Corp. v. Union Planters Bank, N.A., 409 F.3d 1049, 1056 (8th Cir. 2005) (to satisfy the U.C.C.'s earlier version of the 9-332(b) "the plaintiff must establish more than a

defendant's knowledge of a superior security interest . . . ."). Similarly, the U.C.C. appears to place the burden of establishing collusion on the secured party rather than the transferee. Although Article 9 of the U.C.C. does not define "collusion," it borrows the term from Article 8, where it is found in several sections, including § 8-503. Official Comment 3 to U.C.C. § 8-503 provides that the collusion standard requires the secured party to show that the transferee "was affirmatively engaged in wrongful conduct, rather than casting on the transferee any burden of showing that the transferee had no awareness of wrongful conduct" by the transferor. Underlying this rule is the "long-standing policy that it is undesirable to impose upon purchasers of securities any duty to investigate whether their sellers may be acting wrongfully." Id. Accordingly, Amegy, not PWM bears the burden of establishing collusion under § 9-332.

Nevertheless, the Court concludes that Amegy has properly pled collusion to survive Defendants' Motion to Dismiss. Amegy references a document that purportedly shows that Johnson was required to grant to Deutsche Bank and its affiliates "a security interest in all securities and other property" in Johnson's possession as a prerequisite to opening a checking account. Second Amended Complaint (Doc. No. 30), p. 6. The inference is that Defendants colluded with Johnson to deny Amegy its right to the Hotel stocks by permitting Johnson to open a checking account, by requiring Johnson to pledge any and all property in its possession, and by receiving a portion of the funds to pay off interest payments on the Spyglass mortgage. Amegy's single allegation of collusion is not expounded upon but is sufficiently detailed to avoid dismissal. See Twombly, 550 U.S. at 557 ("[T]erms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation – for

example, identifying a written agreement or even a basis for inferring a tacit agreement . . . .").

2.    Conversion Claim against DBS

Amegy contends that DBS is liable for conversion because it helped to dispose of the collateral by permitting Johnson to deposit the collateral proceeds in the Alex.Brown bank account "in the face of a valid financing statement."  Plaintiff's Response, p. 18.

The Court finds that § 9-332 similarly governs Amegy's conversion claims against DBS.  As indicated above, the collateral proceeds deposited into the Alex.Brown account were thereafter transferred to third parties, including to contractors to pay for improvements to Spyglass, to Collier County to discharge tax obligations, and to PWM to pay off a portion of the mortgage.  Once the transfers took place, Amegy lost its security interests in the disbursed proceeds.  However, Amegy's conversion claim against DBS stands because of the purported collusion between DBS and PWM to deprive Amegy of its interest in the collateral proceeds.

Defendants argue that DBS, including its affiliate Alex.Brown never exercised control over the funds and simply followed legitimate banking practices to permit Johnson to deposit the funds into the Alex.Brown bank account.  Apart from the allegation of collusion, Defendants' argument is not without merit.  Several courts have held that a depository bank does not bear the burden to determine the source of funds deposited into its customers' accounts and to determine whether there is a creditor who may have a lien on those funds.  See, e.g., In re Meridian Asset Mgmt., Inc., 296 B.R. 243, 265 (N.D. Fla. 2003) ("Case law imputes no duty on banks to monitor or micro-manage a customer's actions or his money unless there is a previous agreement or the Bank has notice of actual fraud."); Kentucky Highlands Inv. Corp. v. Bank of Corbin,

Inc., 217 S.W. 3d 851, 856 (Ky. Ct. App. 2006).[6]

However, according to the Second Amended Complaint (Doc. No. 30, p. 6), DBS was more than a mere conduit of the funds. It purportedly acted in concert with PWM to require Johnson to transfer any security interest in the funds as a prerequisite to depositing the funds in the Alex.Brown bank account, which were later used to make payments associated with the Spyglass property. Id.

The Eighth Circuit recently addressed a similar set of circumstances in Platte Valley Bank v. Tetra Fin. Group, LLC, 682 F.3d 1078, 1087-88 (8th Cir. 2012). There, Platte Valley Bank claimed a perfected security interest in certain equipment owned by Heggem Construction, which were sold in a sale and leaseback transaction with Tetra Financial Group. Id. at 1080. The transaction provided that Heggem would pay Tetra a purchase price of $565,430 which would be used as a security deposit on the equipment leased to Heggem. Id. at 1081. The funds were deposited into an interest bearing account and later transferred to Republic Bank. Id. at 1080. Platte Valley complained that Tetra and Republic Bank had converted the proceeds of the collateral by depositing the funds into a bank account and by applying the funds to Heggem's obligations under the lease. Id. at 1082. In ruling in favor of Tetra, the Eight Circuit noted first that the U.C.C. "does not require a subsequent creditor to reject an encumbered asset as potential collateral or to treat an existing creditor's interests as paramount to avoid facing liability for conversion." Id. at 1084. Instead, "[t]he UCC

---

[6]The U.C.C. as a whole, affords broad protections to depository banks that facilitate the exchange of funds. For example, banks receive an automatic perfected interest in the accounts of their customers that prevails over any prior conflicting security interest, unless the secured party takes control of the deposit account by becoming the bank's customer. U.C.C. § 9-327. Additionally, a depositary bank may set-off an existing debt against a secured party that holds a security interest in the deposit account. Id. § 9-340(a).

contemplates multiple security interests in the same collateral and devised a system for determining the priority of those interests should they ripen." Id.  The court found that Platte Valley's security interest in the bank account itself was subordinate to Republic, who had possession and control of the account from the time Republic transferred funds into the account.[7] Id. at 1086.  Prior to dismissing the claims, however, the Eight Circuit acknowledged that Platte Valley had raised a potentially viable conversion claim by alleging that Tetra and Republic Bank had colluded with the debtor to violate Platte Valley's rights to the collateral, but dismissed the complaint because Platte Valley had failed to provide enough evidence of the collusion to survive summary judgment. Id.  In support, the court cited Example 2 of the Second Official Comment to U.C.C. § 9-322, "in which the commentators indicate a depository bank that holds a superior interest in a deposit account . . . could be liable to a creditor with a junior interest based upon the depository bank's wrongful conduct in colluding with the debtor . . . ." Id. at 1087.

Here, the conversion claim against DBS is viable because of Amegy's allegation of collusion among Defendants, which Amegy must be able to develop through discovery.  For these reasons, the Court denies Defendants' Motion to Dismiss.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1)      Defendants' Motion to Dismiss and Incorporated Memorandum of Law (Doc. No. 31) is **GRANTED in part and DENIED in part**.  It is **GRANTED** with respect to Plaintiff's equitable subrogation claims concerning DB Private Wealth Mortgage,

---

[7]Unlike the instant lawsuit, Platte Valley Bank involved a security deposit over a bank account, not the funds contained therein. Id. at 1086.  Accordingly, the Eighth Circuit applied U.C.C. § 9-327 to conclude that Republic Bank had perfected its interest by demonstrating possession and control over the account. Id.

which are dismissed with prejudice.   It is **DENIED** with respect to the equitable subrogation claims concerning the tax obligations paid on the Spyglass property.   It is also **DENIED** with respect to Plaintiff's conversion claims against Defendants.

**DONE AND ORDERED** in Chambers in Fort Myers, Florida, on January 9th, 2013.

ROY B. DALTON JR.
United States District Judge

Copies:

Parties and Counsel of Record