UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

AMEGY BANK NATIONAL
ASSOCIATION,

        Plaintiff,

v.                                Case No:  2:12-cv-243-FtM-38UAM

DB PRIVATE WEALTH
MORTGAGE, LTD. and DEUTSCHE
BANK ALEX.BROWN,

        Defendants.

_____/

## ORDER[1]

This matter comes before the Court on the Parties, Plaintiff Amegy Bank N.A. (hereinafter "Amegy") and Defendants DB Private Wealth Mortgage, Ltd. and Deutsche Bank Alex.Brown (hereinafter "Deutsche Bank"), separate motions for summary judgment. There is a pending motion for partial summary judgment with regard to Deutsche Bank's affirmative defenses and there are pending motions for summary judgment with regard to the underlying claims in this matter. (Doc. #65, Doc. #73, Doc. #75, Doc. #76, Doc. #95).These motions are now ripe for review.

---

[1] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents or Web sites. These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other Web sites, this court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

**FACTS**

In 2008, Amegy loaned William B. Johnson and his single member limited liability company, Monarch Flight II, LLC, 15 million dollars to purchase and then repair and upgrade a 1983 Gulfstream Jet, to complete a development project in the Bahamas, known as Orchid Bay, and for other purposes. (Doc. #73-2, ¶8). Johnson executed a Promissory Note obligating Monarch Flight to pay Amegy the loan amount plus interest in monthly payments by May 1, 2011. (Doc. #73-2). As collateral for the loan, Johnson assigned and granted to Amegy a security interest in 825,457 units of partnership interest in Host Hotels & Resorts, L.P., any shares of the Host Hotels & Resorts, Inc. owned by Johnson as a result of the redemption or exchange of the partnership units, and all products and proceeds from the partnership units and/or related stock. (Doc. #73-4, §1.1). The security agreement between Amegy and Johnson explicitly forbade Johnson from selling, assigning, conveying, pledging, or otherwise disposing of the partnership units or the related stock without the prior written consent of Amegy. (Doc. #73-4, §3.2). Upon an "Event of Default" as defined in the Promissory Note, the Security Agreement granted Amegy all rights and remedies of a secured party under the Uniform Commercial Code (hereinafter "UCC"), including the ability to collect, receive, or take possession of the partnership units and related stock. (Doc. #73-4, §5.2). On May 7, 2008, Amegy filed a UCC-1 Financial Statement perfecting its security interest in Johnson's partnership units and related stock. (Doc. #73-5).

In October 2008, Monarch Flight defaulted on the loan. Meanwhile, on or about May 22, 2009, Deutsche Bank created a Know Your Customer (hereinafter "KYC") search

with regard to Johnson.[2] (Doc. #73-10; Doc. #76; Doc. #81-1, at p.78, at 10-23; Doc. #86-1). William Rhodes, a Managing Director of Deutsche Bank Securities, had access to the information provided in the KYC report. (Doc. #73-11). Christian Barsi, an employee of Deutsche Bank Private Wealth Management, also had access to the information provided in the KYC report. (Doc. #73-34, at 46; Doc. #73-23; Doc. #65-58). This KYC report included information regarding Amegy's UCC-1 Financial Statement. (Doc. #73-10).

On October 28, 2009, Amegy sent Johnson a letter with regard to Monarch Flight that requested information in connection with the Promissory Note. (Doc. #73-14). Amegy specifically requested the following by November 13, 2009, "(a) A recent financial statement of Borrower [Monarch Flight], containing balance sheets, statements of income and statements of members' capital; (b) A recent financial statement of Guarantor; (c) Access to the Aircraft so that we may conduct an appraisal of the Aircraft; (d) The limited partnership agreement of Host Hotels & Resorts, L.P.; and (e) Documentation showing the history of dividends received by Guarantor from the Partnership Units." (Doc. #73-14). Johnson's attorney, John T. Bobo, confirmed that he would provide, or at least try to, the information requested and the access to the aircraft upon completion of its renovation.[3] (Doc. #73-15).

On December 10, 2009, Amegy sent an additional letter to Monarch Flight that directed attention to Johnson. (Doc. #73-16). This letter informed Monarch Flight and

---

[2] Deutsche Bank notes they did this to comply with federal law. (See Doc. #76, at 2).

[3] Bobo responded to Plaintiff Amegy's request with an email to Mr. Joseph H. Argue, III of Amegy Bank of Texas. (Doc. #73-15). This email stated in part, "I will provide to you financial information on Monarch Flight II, LLC, later this week. I will also discuss with Mr. Johnson the financial information that he previously provided to you. The aircraft remains in Atlanta and should be completed by the end of this month. We certainly have no objection to your viewing the aircraft but would request that you allow us to complete the renovation prior to that time.... We are trying to retrieve the limited partnership agreement of Host Hotels and Resorts, LP, and will forward you a copy as soon as we have it." (Doc. #73-15).

Johnson that Amegy had not received all of the information it requested in its letter dated October 28, 2009. (Doc. #73-16). Instead, Amegy had only received documentation showing the history of dividends received by Johnson from partnership units in Host Hotels and Resorts, L.P. (Doc. #73-16; Doc. #73-1, ¶5). Accordingly, this letter again requested the information and requested access to the aircraft that Amegy had not yet received. (Doc. #73-16; Doc. #73-14). This letter also demanded Monarch Flight to pay the "Required Paydown," also referred to as the "Mandatory Prepayment," of $7,500,000.00 pursuant to the Promissory Note no later than December 31, 2009. (Doc. #73-16; Doc. #73-2, at ¶6(b)[4]. In response and through Bobo, Monarch Flight provided the requested information less Johnson's financial statement.[5] (Doc. #73-17).

Just a few days later, Johnson submitted a notice of redemption to Host Hotels & Resorts, L.P. seeking to "expeditiously" dispose of his Partnership Units. (Doc. #73-18). Johnson represented that this Host Stock was unencumbered, free and clear of the rights of or interests of any other person or entity, and that he had the full right, power and authority to redeem and surrender such Units. (Doc. #65-18). Host Hotels & Resorts, Inc. elected to purchase Johnson's interest in the partnership and pay him with shares of stock in Host Hotels & Resorts, Inc. as consideration of acquiring Johnson's partnership units. (Doc. #60, ¶3.11; Doc. #60; ¶3.11). This was done despite the language in the Promissory Note that "Debtor shall not sell, assign, convey, pledge or otherwise dispose of the

---

[4] The Promissory Note stated, "If any appraisal of the Aircraft and the Real Property shows that the combined value of the Aircraft and the Real Property is such that the ratio of the outstanding principal amount of this Note to the appraised value of the Aircraft (the 'Loan to Value Ratio') is greater, than fifty percent (50%), Borrower shall be required to prepay this Note (the 'Mandatory Prepayment') in an amount such that the Loan to Value Ratio is less than or equal to fifty percent (50%)."

[5] Johnson's financial information was not provided because "[h]e was under the impression that his financial statement was never a condition of the loan," however, if Plaintiff Amegy provided the information that he previously supplied Plaintiff Amegy, then Johnson was willing to supplement this provided financial information. (Doc. #73-17).

Collateral or any part thereof without the prior written consent of Secured Party." (Doc. #73-4, §3.2).

On January 12, 2010, Bobo emailed Amegy's counsel and stated "Mr. Johnson is in the process of closing a transaction and will make the January payment in approximately ten days." (Doc. #73-24). There is evidence that Johnson made a payment to Amegy on January 26, 2010. (Doc. #73-7, at 18). Nonetheless, also on January 12, 2010, Rhodes, Managing Director of Deutsche Bank Securities, sent an email with the subject of the email being William B. Johnson. (Doc. #73-26). This email simply stated, "We open[]ed an account for him to do a loan last year. Please take that information and let me know what we need to do to set it up to trade stocks. Need FAST." (Doc. #73-26). Just a few days later, through Rhodes, Johnson opened a margin account at Defendant Deutsche Bank Alex.Brown. (Doc. #73-27; Doc. #75, at 10; Doc. #85-1, at 43). After receiving the official stock certificate for Johnson's 843,199 shares in Host, the stock was sold and $9,516.052.12 was deposited into Johnson's Deutsche Bank Alex.Brown brokerage account. (Doc. #85-17; Doc. #85-15). This money was then transferred to Johnson's JP Morgan Chase Bank, N.A. (Doc. #85-16; Doc. #85-18).

Without Amegy's knowledge or consent, Johnson paid at least $98,177.25 of the funds to DB Private Wealth Management on a mortgage loan given by Deutsche Bank made on a real property known as Spyglass. Johnson also paid $407,394.04 to non-party contractors to make improvements on the Spyglass property and an additional $81,849.39 to Collier County Tax Collector to discharge tax obligations on the property. DB Private Wealth Management holds a first priority security interest and lien on the Spyglass property, which is otherwise unrelated to the Amegy transaction.

**STANDARD**

Adjudications of partial summary judgment motions are authorized under Fed. R. Civ. P. 56(d) and are governed by the standards for summary judgment in Fed. R. Civ. P. 56(c). See e.g., Johns v. Jarrard, 951 F.2d 551, 554-56 (11th Cir. 1991). Partial summary judgment rulings are not immutable and have no *res judicata* effect; they may under appropriate circumstances be revisited. Burge v. Parish of St. Tammany, 187 F.3d 452, 467 (5th Cir. 1999). Parties, however, are entitled to rely on the conclusiveness of the partial summary adjudication and absent good cause the Court will not generally revisit or alter the issues adjudicated under Rule 56(d). Carr v. O'Leary, 167 F.3d 1124, 1126 (7th Cir. 1999). The Rule reads in pertinent part:

> [i]f on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

Fed. R. Civ. P. 56(d).

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue is genuine if there is sufficient evidence such that a reasonable jury could return a verdict for either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 U.S. 2505, 91 L. Ed. 2d 202 (1986). Similarly, an issue is material if it may affect the outcome of the suit under governing law. Id.

6

The moving party bears the burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In deciding whether the moving party has met this initial burden, the Court must review the record and all reasonable inferences drawn from the record in the light most favorable to the non-moving party. Whatley v. CNA Ins. Co., 189 F.3d 1310, 1313 (11th Cir. 1999). Once the Court determines that the moving party has met its burden, the burden shifts and the non-moving party must present specific facts showing that there is a genuine issue for trial that precludes summary judgment. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, (1986). "The evidence presented cannot consist of conclusory allegations, legal conclusions or evidence which would be inadmissible at trial." Demyan v. Sun Life Assurance Co. of Canada, 148 F. Supp. 2d 1316, 1320 (S.D. Fla. 2001) (citing Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991)). Failure to show sufficient evidence of any essential element is fatal to the claim and the Court should grant the summary judgment. Celotex, 477 U.S. at 322-23. Conversely, if reasonable minds could find a genuine issue of material fact then summary judgment should be denied. Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1532 (11th Cir. 1992). "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." Allen v. Bd. of Pub. Educ., 495 F.3d 1306, 1315 (11th Cir. 2007).

**DISCUSSION**

A. **Choice of Law**

The Court will first address the choice of law in this matter. The Parties inconsistently cite to laws in several states such as Florida, Georgia, New York and Texas throughout their legal arguments. The Parties have provided contradictory choice of law arguments. (See Doc. #75; Doc. #90; Doc. #95).

Amegy contends Texas law should govern this matter. Amegy asserts four arguments to support this contention. First, Amegy asserts the security agreement contains a choice of law provision that maintains Texas law governs the disputes arising out of the security agreement. Second, Amegy asserts the security agreement was created and entered into in the State of Texas. Third, Amegy asserts the UCC provides that security agreements can be brought against creditors and not just the parties in the security agreement. Fourth, Amegy asserts its injury occurred in Texas because its "injury is the loss of said payment, which necessarily occurred in Texas." (Doc. #95, at 4).

Deutsche Bank contends since Deutsche Bank was not a party to the security agreement they are not bound to the choice of law agreement made between Amegy and Johnson. Deutsche Bank relies on Section 146 of the Restatement (Second) of Conflicts of Laws to contend the law of the state where the injury occurred governs, unless some other state has a more significant relationship to the occurrence or the parties. Defendants further assert Amegy's injuries occurred in Georgia when Johnson sold the Host Stock through Alex.Brown in violation of Amegy's security interest. Deutsche Bank asserts in the alternative New York law governs the Alex.Brown Account Agreement and Alex.Brown's sale of the Host Stock. New York is also where DB Private Wealth Mortgage

Ltd. received Johnson's mortgage payments. Finally Deutsche Bank asserts Deutsche Bank's relationships with Amegy are not centered in Florida or Texas.

Federal courts sitting in diversity apply the conflict of laws rules of the forum state. Grupo Televisa, S.A. v. Telemundo Communications Group, Inc., 485 F.3d 1233, 1240 (11th Cir. 2007) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). In addition, the Court must characterize the legal issue, such as whether it is a contract, tort, or property issue. Grupo Televisa, 485 F.3d at 1240. After characterizing the legal issue, the Court then determines the choice of law rule that the forum state applies to that particular type of issue. Id. (citing Acme Circus Operating Co., Inc. v. Kuperstock, 711 F.2d 1538, 1540 (11th Cir. 1983)). In Florida, courts resolve conflict of laws disputes according to the "most significant relationship" test as outlined in the Restatement (Second) of Conflict of Laws. Grupo Televisa, 485 F.3d at 1240 (citing Bishop v. Florida Specialty Paint Co., 389 So.2d 999, 1001 (Fla. 1980)). Courts consider the following factors when determining the most significant relationship: (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered. McMahan v. Barker, No. 6:06-cv-248-Orl-28KRS, 2008 WL 68595 at *5 (M.D. Fla. Jan. 4, 2008) (citing Restatement (Second) Conflict of Law § 145 (1971)).

Here the claims in this action are declaratory judgment, conversion, aiding and abetting, and conspiracy. (Doc. #60). With regard to the declaratory judgment claim involving a contract, herein the security agreement, Amegy seeks a declaration of an equitable lien to the extent that the proceeds from the sale of Amegy's collateral were

used to benefit the Property or extinguish any delinquent taxes. (Doc. #60, at 12). Importantly, a UCC comment clarifies that "a securities agreement is effective between the debtor and secured party and is likewise effective against third parties." UCC § 9-201, cmt 2. Therefore, with regard to the declaratory judgment claim the security agreement can be properly brought against Deutsche Bank even though they are not parties to the security agreement and the choice of law provision within the security agreement can therefore be controlling in a claim against Deutsche Bank. See FPF, Inc. v. AAAA Auto Ins. of Orlando, Inc., No. 6:01-cv-1285-ORL-19J, 2002 WL 32050204 at *7, at n. 5 (M.D. Fla. Sept. 2, 2002) ("A security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors."); see also Western Group Nurseries, Inc. v. Ergas, 211 F.Supp.2d 1362, 1366 (S.D. Fla. 2002) ("Florida enforces choice-of-law provisions as to contractual claims unless the law of the chosen forum contravenes strong public policy.") (citing Mazzoni Farms, Inc. v. E.I. DuPont De Nemours and Co., 761 So.2d 306, 311 (Fla. 2000)); Land-Cellular Corp. v. Zokaites, 463 F.Supp.2d 1348, 1360 (S.D. Fla. 2006) ("Florida courts must uphold an otherwise usurious agreement 'by applying foreign law if the foreign jurisdiction has a normal relation to the transaction and would also favor the agreement.'") (quoting Continental Mortgage Investors v. Sailboat Key, Inc., 395 So.2d 507, 512 (Fla. 1981)). The plain language of the security agreement also broadly provides it "shall be governed by and construed in accordance with the laws of the State of Texas." (Doc. #65-4). Therefore, the declaratory judgment action is governed by Texas law.

With regard to the conversion, aiding and abetting, and conspiracy claims, all common law tort actions, the law of where the most significant relationship with the

particular issue governs. Here, the claims are all brought against Deutsche Bank with regard to Deutsche Bank's alleged tortious conduct that occurred in Georgia. Defendants communicated with Johnson when they were in Georgia. (Doc. #60, at 7; Doc. #69, at 5). Defendants researched Johnson and his credit history when they were in Georgia. (See e.g., Doc. #60-6). Johnson, even though not a party in this matter, also sold the Host Stock in Georgia. Deutsche Bank obtained the Host Stock certificate in Georgia. (Doc. #73-12, at 23). Therefore it appears that most of the alleged conduct of conversion, aiding and abetting, and conspiracy all occurred in Georgia. The Court has not been directed to any persuasive evidence to the contrary.

Georgia law has the most significant relationship to the tort claims in this matter even though Amegy who sits in Texas was conceivably injured in Texas in some way by Deutsche Bank. This is also true even though Deutsche Bank Alex.Brown received at least one mortgage payment from Johnson in New York. This is true even though the Parties are incorporated in different states such as Delaware, Texas, and New York. (Doc. #60, at 1-2). Finally, this is also true because there is no relationship between Amegy and Deutsche Bank centered in one state. Accordingly, the Court finds ultimately the State of Georgia has the most significant relationship to the occurrences and the parties in this matter and therefore Georgia law governs these three tort claims.

### B. **Motion for Partial Summary Judgment with regard to Defendants' Affirmative Defenses**

Amegy filed a five-count Third Amended Complaint against Defendants.[6] (Doc. #60). In response, Defendants filed an answer and 21 affirmative defenses. (Doc. #69).

---

[6] Count I is a Declaratory Judgment action; Count II is a conversion action; Count III is an aiding and abetting action; Count IV is a conspiracy action; and Count V is an exemplary damages action. (Doc. #60).

This motion for partial summary judgment seeks to eliminate Defendants' affirmative defenses. (Doc. #73). Defendants have filed a response in opposition. (Doc. #90).

> i.       Amegy has not demonstrated Deutsche Bank acted collusively

Deutsche Bank's first affirmative defense is:

> PWM was an innocent transferee of money or funds from a deposit account pursuant to § UCC 9-332, codified at Fla. Stat. § 679.332. Any monies or funds that PWM received from a deposit account of William Johnson and in which Amegy purportedly had a security interest were transferred to PWM free of any security interest. PWM had no knowledge of Amegy's purported security interest in the Host Collateral and did nothing to collude with the debtor Johnson to deprive Amegy of its security interest.

(Doc. #69, at 10).

Amegy asserts Deutsche Bank is not entitled to UCC § 9-332 protection because Deutsche Bank colluded with Johnson in disposing of the collateral. See UCC § 9-332(b) ("A transferee of funds from a deposit account takes the funds free of a security interest in the deposit account unless the transferee acts in collusion with the debtor in violating the rights of the secured party."). Amegy asserts Rhodes was aware of Amegy's creditor relationship to Johnson with regard to the Partnership Units and Host Stock. Further, Amegy asserts Rhodes exercised control over the Host Stock which ultimately resulted in the loss of money that would have otherwise provided repayment to Amegy for the loan Amegy made for Johnson. Amegy relies heavily on email exchanges between Rhodes and Martin, and Rhodes and a member of his staff, to attempt to demonstrate that Deutsche Bank alleged collusive actions. (Doc. #73-25; Doc. #73-26).

In Deutsche Bank's response, it is asserted that Johnson presented the Host Stock to Rhodes at Alex.Brown rather than to DB Private Wealth Management. Further, Deutsche Bank contends DB Private Wealth Management had nothing to do with the Host

Stock sale which is corroborated by the Barsi's deposition testimony. Deutsche Bank also assert the email sent by Johnson's assistant to Amegy's counsel on January 12, 2010, is unauthenticated hearsay.

The UCC offers broad protection to transferees who take funds from a deposit account. UCC § 9-332 cmt 2. Broad protection is given in order to "ensure the security interests in deposit accounts do not impair the free flow of funds." UCC § 9-332 cmt 3. Claims brought against transferees should be severely limited. Id. Despite the policy of supporting the free flow of funds and limiting the availability of claims, bad actors should be held accountable for their collusive conduct. UCC § 9-332 cmt 2-4. That is, wrongfully moving funds from an account amounts to a debtor acting in collusion with a bank. UCC § 9-332 cmt 5. When this occurs the bank does not take the funds free of the lender's security interest and the bank will be liable for its wrongful conduct to the lender. UCC § 9-332 cmt 5.

The burden of proving collusion is on the moving party. In re Montagne, 413 B.R. 148, 519 (2009) ("presents a substantial burden on parties seeking to prove conversion claims involving money."). Courts look to Article 8 and accordingly to the Restatement (Second) of Torts § 876 (1979) to analyze whether collusive acts have occurred. UCC § 9-332 cmt 4; See In re Montagne, 413 B.R. 148 (2009).[7] The moving party must prove

---

[7] The Restatement provides three alternative tests to establish collusion:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he –
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

collusion by establishing "more than a defendant's knowledge of a superior interest." General Elec. Capital Corp. v. Union Planters Bank, N.A., 409 F.3d 1049, 1056 (8th Cir. 2005). In fact, the moving party must show the transferee "was affirmatively engaged in wrongful conduct." UCC § 8-503 cmt. 3.

Here Amegy has the burden of proving collusion and to do so Amegy must establish more than a Deutsche Bank's knowledge of a superior security interest. Amegy's motion for summary judgment does nothing more than allege Deutsche Bank was aware of Amegy's creditor relationship to Johnson and that Deutsche Bank exercised control over the Host Stock which ultimately resulted in the loss of money. This argument alone does not prove Deutsche Bank affirmatively engaged in wrongful conduct and accordingly committed collusion. The Court will now turn to the evidence presented by Plaintiff.

There is a general rule that inadmissible hearsay cannot be considered on a motion for summary judgment. Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999). The district court, however, may "consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." Sklar v. Clough, No. 1:06-CV-0627-JOF, 2007 WL 2049698 at *2 (N.D. Ga. July 6, 2007) (citing Macuba, 193 F.3d at 1323); McMillian v. Johnson, 88 F.3d 1573, 1584 (11th Cir. 1996)).

Exhibit R is an email from Rhodes to Martin dated January 12, 2010, at 11:01 a.m. (Doc. #73-25). There is nothing in the body of the email, however, the subject line simply states "let me know if you need my help!" (Doc. #73-25). Contrary to Deutsche Bank's

---

Restatement § 876.

assertion, the email indicates Rhodes wrote this email as the Managing Director of Deutsche Bank Securities rather than as a representative of Deutsche Bank Alex.Brown. (Doc. #73-25).[8] Although this email is not currently authenticated, this email can be authenticated at trial. This email is not being presented to assert the truth of the matter asserted, but is being presented to show Rhodes and Deutsche Bank Securities relationship as it relates to the issues in this case. This circumstantial evidence is highly relevant to Rhodes and Deutsche Bank Securities' involvement in Johnson's financial dealings. This evidence is admitted for summary judgment purposes.

Exhibit S is an email from Rhodes to his assistant, Ashley Abbott, dated January 12, 2010, at 11:02 a.m. (Doc. #73-26). The subject line simply states "William B Johnson" and the body of the email states "We openned [sic] an account for him to do a loan last year. Please take that information and let me know what we need to do to set it up to trade stocks[.] Need FAST." (Doc. #73-26). Again, this email was written by Rhodes as the Managing Director of Deutsche Bank Securities. (Doc. #73-26). Although this email is not currently authenticated, this email can be authenticated at trial. This email is not being presented to assert the truth of the matter asserted, but is being presented to show Rhodes, Deutsche Bank Securities, and Johnson potentially acted in concert with each other. This circumstantial evidence is highly relevant to Rhodes and Deutsche Bank Securities' involvement in Johnson's financial dealings. This evidence is admitted for summary judgment purposes.

Exhibit U is an email sent from Martin on behalf of Johnson to ComputerShare to have the share certificates sent out the same day as issued. (Doc. #73-28). Rhodes was

_____

[8] At the time this email was written, Rhodes had not set up Johnson's account with the Deutsche Bank Alex.Brown division as of yet. (Doc. #73-12, at 19).

blind carbon copied on this email, through his Deutsche Bank Securities email, as demonstrated by Exhibit V. (Doc. #73-29). Although these emails are not currently authenticated, these emails can be authenticated at trial. These emails are not being presented to assert the truth of the matter asserted, but are being presented to show the relationship Rhodes and Defendants had with Johnson and to show potentially that they acted in concert together. This evidence is admitted for summary judgment purposes.

Rhodes also concedes in his deposition he was aware that Johnson wanted to sell his shares of Host Marriott. (Doc. #73-12, at 19). Rhodes admitted he agreed to open another account for Johnson. (Doc. #73-12, at 19-20). Rhodes admitted this new account would be used to allow Johnson to conduct any securities transaction that Johnson wanted and therefore included the ability to sell the Host Hotels stock. (Doc. #73-12, at 20). Rhodes believes he went to pick up the physical stock certificates from Martin himself. (Doc. #73-12, at 23).

The evidence presented by Amegy and viewed in light of Deutsche Bank only presents an inference as to what happened rather than eliminating all material disputes. The Court has some doubts as to whether Deutsche Bank acted collusively with Johnson. This is a question of fact for the jury to determine. Accordingly, the Court finds Amegy is not entitled to summary judgment in relation to Deutsche Bank's first affirmative defense.

     *ii.*    *Amegy perfected its security interest in the Partnership Units, Host Stock and the proceeds of the same, however, the proceeds may not be traceable*

Deutsche Bank's second affirmative defense is "Amegy failed to perfect its security interest in the proceeds of Johnson's partnership interest in Host Hotels & Resort, L.P. and shares of Host Hotels & Resorts, Inc." (Doc. #69, at 10). Deutsche Bank's third affirmative defense is

> Any security interest that Amegy purportedly had in the proceeds of Johnson's partnership interest in Host Hotels & Resorts, L.P. and shares of Host Hotels & Resorts, Inc., if perfected, lost priority once the proceeds were commingled with other funds and thereafter paid out to third parties PWM, the tax collector and contractors as they became unidentifiable and traceable.

(Doc. #69, at 8-9). And Deutsche Bank's eighth affirmative defense is "[t]he conversion count fails because the purported proceeds at issue were not deposited into an account designed to keep money segregated and identifiable nor was there any obligations or fiduciary duty to keep such monies segregated." (Doc. #69, at 12).

Amegy contends summary judgment should be granted with these affirmative defenses because Deutsche Bank has not argued Amegy did not perfect its security interest in Host Hotels & Resorts, L.P. and Host Hotels & Resorts, Inc. Amegy asserts it had a direct security interest in the Host Stock and its proceeds. Amegy asserts the proceeds of the sale of the Host Stock are directly traceable to Amegy's security interest.

In response, Deutsche Bank asserts these affirmative defenses are valid because Amegy cannot trace any payments made by Johnson to Deutsche Bank Private Wealth Management, the tax collector, or vendors back to the Host Stock sale proceeds. Deutsche Bank further asserts that the only proceeds that Amegy can trace to the Host Stock sale that were deposited into a Case Deposit Account are more than $568,672.76 worth of payments that Johnson made to Amegy on the Monarch Flight Loan from his Chase Deposit Account. Deutsche Bank also notes that Amegy cannot trace payments to the Host Stock sale proceeds without evidence as to the beginning and without evidence as to the ending account balances in Johnson's Chase Deposit Account. Defendants rely on Adler v. Hertling, 451 S.E. 2d 91, 96-97 (Ga.App. 1994).

The evidence shows Amegy perfected its interest in the host stock and it proceeds. (Doc. #73-5) (The financial statement filed in Georgia Superior Court states that the stock collateral was "Any shares of Host Hotels & Resorts, Inc. owned by Debtor as a result of the redemption or exchange of the LP United [825,457 units of partnership interest in Host Hotels & Resorts, L.P.] or otherwise arising from or related to the LP Units"). Deutsche Bank had some level of notice, but not necessarily actual knowledge, because it had access to information that Amegy perfected its interest in its collateral. UCC § 9-315; See e.g., Leasing Service Corp. v. Hobbs Equipment Co., 894 F.2d 1287, 1290 (11th Cir. 1990). The Host Stock was sold and the proceeds were wired to Rhodes and Abbott. (Doc. #73-18; Doc. #73-19; Doc. #73-32; Doc. #73-33). These proceeds were then deposited in Johnson's Chase bank account. (See Doc. #85-15).

The Court recognizes that it is unclear whether these proceeds were later commingled with other money in Johnson's Chase bank account. See generally, Matter of Weaver, 93 B.R 172, 175 (N.D. Ind. 1988) (explaining when proceeds are commingled with other money; they lose the nature of the proceeds); c.f. Aycock v. Texas Commerce Bank, N.A., 127 B.R. 7, 19 (S.D. Tx. 1991) (finding that "[t]he deposit account contained only proceeds from the stock pledge, which makes the proceeds identifiable and traceable."); c.f. In re Howards Appliance Corp., 91 B.R. 208, 211 (E.D. N.Y. 1988) (finding that the funds may still be traceable even though they are commingled in an account). Nonetheless, the record clearly traces the proceeds of the Host Stock into the Deutsche Bank Alex.Brown account. (Doc. #85-15, at 4). There is a possibility that the Host Stock proceeds are not fully traceable thereafter. Amegy has not established its summary judgment burden with regard to these affirmative defenses. Therefore, the Court

finds Amegy did perfect its security interest in the Host Stock and the proceeds therefore Deutsche Bank's second affirmative defense is due to be denied; however, the Court is unable to determine whether the proceeds are indeed traceable thereafter. Accordingly, Deutsche Bank's third and eighth affirmative defenses are due to stand.

### iii.    Defendant DB Private Wealth Management Exercised Control Over Amegy's Security Interest

Amegy next contends Deutsche Bank's eighth, ninth, tenth, and eleventh affirmative defenses should be eliminated. Deutsche Bank's eighth affirmative defense is, "The conversion count fails because the purported proceeds at issue were not deposited into an account designed to keep money segregated and identifiable nor was there any obligation or fiduciary duty to keep such monies segregated." (Doc. #69, at 12). Deutsche Bank's ninth affirmative defenses is, "The conversion count fails because Alex.Brown never possessed or otherwise exercised control or dominion over Amegy's purported collateral or proceeds. Alex.Brown at all times followed standard, recognized banking practices in permitting Johnson to deposit funds into an Alex.Brown account." (Doc. #69, at 13). Deutsche Bank's tenth affirmative defense is, "Amegy's claim of conversion fails because no Defendant ever possessed or otherwise exercised control or dominion over the purported proceeds that Johnson paid over from his Chase Deposit Account to the tax collector and third party contractors." (Doc. #69, at 13). Finally, Deutsche Bank's eleventh affirmative defense is, "Amegy's claim of conversion fails because there is no duty of a depository bank to determine the source of funds deposited into its customer's accounts and to determine whether there is a creditor who may have a lien on those funds" (Doc. #69, at 13).

These affirmative defenses all relate to Amegy's conversion claim. Amegy relies on Bel-Bel Intern. Corp. v. Community Bank of Homestead, 162 F.3d 1101 (11th Cir. 1998).[9] In this case, the defendants that exercised control over receivables were wrong because the receivables had been previously pledged to plaintiff as a security, and pursuant to the security agreement, the defendants did not have the right to unilaterally take control of the receivables. Bel-Bel Intern, 162 F.3d 1101, at 1108. Therefore, the Eleventh Circuit found that the plaintiff had a strong conversion claim. Id. Amegy relies on Bel-Bel Intern to simply assert since "Defendants were interfacing with Johnson, he was in default of his obligations to Amegy, and Amegy had a present right to possession of its collateral," therefore Deutsche Bank's eighth, ninth, tenth, and eleventh affirmative defenses should be dismissed. (Doc. #73, at 14).

In response, Deutsche Bank contends Bel-Bel Intern does not apply to this matter because it is a case involving a pledge of accounts receivable by the owner of tomato farms. Further, since investment property was not involved in the Bel-Bel Intern case, Deutsche Bank contends the UCC protections did not apply to Bel-Bel Intern. Further, Deutsche Bank maintains they innocently transferred funds.

Under Georgia law, to prove conversion, a plaintiff must show there was an "unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his right; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation." Kristler v. F.D.I.C., No. CV411-024, 2013 WL 265803 at *6 (S.D. Ga. Jan. 23, 2013) (citing Decatur

---

[9] This case applies Florida law. The Court recognizes that Florida and Georgia have the same elements to establish conversion a claim. See McMahan v. Barker, No. 6:06-cv-248-Orl-28KRS, 2008 WL 68595, at *9 (M.D. Fla. Jan. 4, 2008) (citing Both v. Frantz, 278 Ga.App. 556 (Ga.App.2006); Senfeld v. Bank of Nova Scotia Trust Co. (Cayman) Ltd., 450 So.2d 1157, 1161 (Fla. 3d Dist.Ct.App. 1984)).

Auto Cntr. v. Wachovia Bank, N.A., 276 Ga. 817, 819 (2003)). The right involved must be "absolute, unconditional, and exist at the time the action is commenced." Kristler, 2013 WL 265803 at *6 (citing Gilbert v. Rafael, 181 Ga.App. 460, 460 (1987)).

The record is clear, Amegy and Johnson entered into a contract in which the Host Stock was collateral to secure a $15 million loan. (Doc. #73-2; Doc. #73-4). Johnson defaulted on his loan. (Doc. #73-1, at 1; Doc. #73-37). Accordingly, in January 2010, Amegy had the right to possess its collateral. (Doc. #73-2, at 3-4). Johnson redeemed the Host Stock contrary to the agreement. (Doc. #73-4, at 4; Doc. #73-18). Deutsche Bank was on some level of notice of Amegy's security interest. Leasing Service Corp. v. Hobbs Equipment Co., 894 F.2d 1287, 1290-91 (11th Cir. 1990) (finding pursuant to the filed financial statement, defendant's possession of the financial statement at the time it extended credit, and the security agreement the defendant was on notice.). This fact is corroborated by Deutsche Bank's independent research of Johnson that included a KYC report. (Doc. #73-10). This KYC report included information regarding Amegy's Financial Statement. (Doc. #73-10, at 18). Despite this, Deutsche Bank unlawfully took possession of the security interest. (Doc. #73-12, at 23). See DaimlerChrysler Financial Services Americas LLC v. Nathan Mobley Chrysler Dodge, Jeep, Inc., No CIV A CV206-021, 2006 WL 3762087 at *4 (S.D. Ga. Dec. 20. 2006) (Defendants were found to be liable to plaintiff for conversion after they sold vehicles out of trust and used the proceeds therefrom to pay other debts or obligations).

The Court is without benefit of argument, case law from the Parties, and citation to the record to soundly reject all of these affirmative defenses now. Therefore, even if these defenses are due to be denied, the Court is unwilling to do so now. The Court, however,

will dismiss Deutsche Bank's tenth defense because clearly D.B. Private Wealth Management took control of Amegy's collateral.

    *iv.*    *A Laches Defense is Not Proper Where a Party Perfects its Security Interests*

        Deutsche Bank's fourteenth affirmative defense is, "Plaintiff is barred from equitable relief because of its lack of vigilance and slumber and inattention to its rights…." (Doc. #69, at 14). Amegy contends this defense is not available in this situation and therefore should be dismissed. In response, Deutsche Bank makes a general laches argument and argues equity aides the vigilant and not those who slumber on their rights. The Court does not find Deutsche Bank's defense to be proper especially in light of finding Amegy did perfect its security interest by filing a financial statement. See generally, In re Fullop, 125 B.R. 536, 545 (S.D. Ill. 1990) (because the Court found that a party perfected its security interest it did not address the issue of laches). Therefore, Deutsche Bank's fourteenth affirmative defense is due to be denied.

    *v.*    *Amegy was not Required to Take Control of its Security Interest*

        Deutsche Bank's fifteenth affirmative is, "Amegy has failed to mitigate its alleged damages…. Amegy failed to obtain a control agreement that might have protected it from the loss of its collateral." (Doc. #69, at 14). Amegy asserts that the proper way to perfect an interest in collateral is to file the financial statement, therefore, Amegy asserts it is immaterial whether it could have done anything above and beyond because it did not have a duty to do so.

        In response, Deutsche Bank contends the filing of a financial statement is not notice of an adverse claim to a financial asset and that a secured party must obtain control of its security interest. Deutsche Bank relies on OCGA § 11-8-105(e) and OCGA § 11-9-

328 cmt. 3. Deutsche Bank also asserts that Amegy failed to obtain a copy of the Host Limited Partnership Agreement, to communicate with Host that Amegy had pledged the Host Units to it before they were converted, and to act to enforce its lawful remedies upon Johnson's default just months after the May 2008 closing.

Although some courts may find that the filing of a financial statement is notice, in Georgia this simple filing is not sufficient. See generally, Matter of E.A. Fretz Co., Inc., 565 F.2d 366, 370 (5th Cir. 1978) (agreeing that filing a financial statement gave simple notice and is all that is required); see also O.C.G.A. § 11-8-105(e) ("Filing of a financing statement under Article 9 of this title is not notice of an adverse claim to a financial asset."). Nonetheless, there is evidence that Deutsche Bank was aware of the adverse claim because they had access to the financial statement information. In addition, mitigation does not seem to be an issue in this matter. Control of a stock could be an issue in some cases but the record does not support one now. See e.g., Tx. Bus. Code. § 9.328(1) ("A security interest held by a secured party having control of investment property under Section 9.106 has priority over a security interest held by a secured party that does not have control of the investment property."). The Court finds this affirmative defense is due to stand.

> vi.     Amegy's possible recovery can be limited by its recovery from other sources but Amegy's claims are not barred from recovery from other sources

Deutsche Bank's sixteenth affirmative defense is,

> Amegy's claims are barred or limited to the extent Amegy recovered benefits, insurance proceeds, and/or proceeds from a collateral source including, but not limited to, proceeds recovered by Amegy upon the sale of the Gulfstream G-III jet plane given it as collateral by Johnson and Amegy's settlement with other parties including Johnson's Tennessee counsel.

(Doc. #69, at 14).

Amegy asserts it is not seeking the entirety of damages that Amegy is entitled to recover. Amegy asserts that an unsatisfied judgment against one tortfeasor will not operate as a bar to an action against another tortfeasor, provided, that the plaintiff may finally satisfy only one judgment. Amegy asserts that the unsatisfied judgment against Johnson is immaterial to this dispute and this affirmative defense should be dismissed. In response, Deutsche Bank asserts that Amegy may be entitled to recover money from other sources such as Johnson and Host Hotels & Resort, L.P. and therefore, these collateral sources of money should be considered when determining the potential amount of damages the Deutsche Bank may owe Amegy.

With regard to the declaratory judgment action, Deutsche Bank's defense may be valid. Under general contract law a party should not benefit more from a contract's breach than from its performance. Global Petrotech, Inc. v. Engelhard Corp., 824 F.Supp. 103, 104 (S.D. Tx 1993) (citing Restatement (Second) of Contract § 347 cmt. e (1981)). "The fundamental principle that a party's liability is not reduced by payments or other benefits received by the injured party from collateral sources is less compelling in the case of a breach of contract than in the case of a tort." Id.

With regard to the three tort actions, the Court finds the collateral source rule applies. Therefore, "[i]t is the tortfeasor's responsibility to compensate for all harm that he causes, not confined to the net loss that the injured party receives." Amalgamated Transit Union Local 1324 v. Roberts, 263 Ga. 405, 406 (1993) (citing Restatement (Second) of Torts § 920A comment (b), p. 514). Courts are concerned with admonition of the wrongdoer. Amalgamated Transit Union, 263 Ga. at 406. Therefore, tortfeasors are not permitted to present evidence to a jury that plaintiff previously received compensatory

payments from another source. Andrews v. Ford Motor Co., 310 Ga.App. 449, 451 (2011)

(citing Hoeflik v. Bradley, 282 Ga.App. 123, 124(1) (2006)). Accordingly, Deutsche Bank's

sixteenth affirmative defense is due to be denied in part. Amegy's claims are not barred.

Depending on the circumstances, however, Amegy's recovery could be limited. See

generally, Andrews, 310 Ga.App. at 451 ("Nevertheless, even when the collateral source

rule applies and the court excludes from the trial evidence that the plaintiff received

compensation from someone other than the tortfeasor, the rule does *not* provide that a

plaintiff is entitled to *collect* from both his or her insurer and from the defendant tortfeasor

for the same item of damages."). Consequently, this is an issue of law rather than an

issue of fact.  That is, Deutsche Bank cannot produce evidence at trial with regard to

collateral sources of money given to Amegy.

> vii.    *UCC § 8.115 may apply in this matter*

Deutsche Bank's seventeenth affirmative defense is

> Alex.Brown is a securities intermediary that transferred a financial asset
> pursuant to an effective entitlement order and/or a broker that dealt with a
> financial asset at the direction of its customer Johnson and is not liable to
> Amegy pursuant to UCC 8-115, as codified under the state law applicable
> to the transaction

(Doc. #69, at 15).

Amegy asserts that this UCC defense is not applicable when a defendant has

acted in collusion with the wrongdoer in violating the rights of the adverse claimant. UCC

§ 8-115(2). In response, Deutsche Bank avers Amegy has failed to prove Alex.Brown has

acted collusively. As previously stated, the Court finds that there is a material dispute as

to whether Deutsche Bank acted collusively with Johnson, and therefore, summary

judgment is not warranted on this defense. Therefore, Deutsche Bank's seventeenth defense is due to stand.

viii.    *Georgia Law Does Not Recognize Aiding and Abetting Claims*

Deutsche Bank's eighteenth defense is, "To the extent that Georgia law applies, Amegy's claim for aiding and abetting fraud is barred. Georgia does not recognize a claim for aiding and abetting fraud." (Doc. #69, at 15). Amegy asserts that Georgia law prohibits one or more persons from acting in concert to commit a tort. Amegy relies on Wright v. AIMCO, 315 Ga. App. 587, 595 (2012). Therefore, Amegy asserts this affirmative defense should be denied.

In response, Deutsche Bank asserts the case Amegy relies on does not involve an aiding and abetting fraud claim. Deutsche Bank reasserts the eighteenth affirmative defense should stand and points the court to consider two other cases. Specifically, Hays v. Paul, Hasting, Janofsky & Walker LLP, No. CIV.A.106CV754-CAP, 2006 WL 4448809, at *8 (N.D. Gal. Sept. 14, 2006) and BMC – The Benchmark Mgmt. Co. v. Ceebraid-Signal Corp., No. 1:05-CV-1149-WSD, 2007 WL 2126272, at *11 (N.D. Ga. July 23, 2007).

Reviewing the cases cited by both Parties, the Court finds Deutsche Bank's arguments to be availing. It is clear, Georgia does not recognize the tort of aiding and abetting fraud. Hays, 2006 WL 4448809, at *8. Therefore, Amegy is not entitled to summary judgment on this affirmative defense.

ix.    *Defendants' Nineteenth Affirmative Defense is Due to be Denied as Moot Pursuant to this Court's Choice of Law Determination*

Deutsche Bank's nineteenth affirmative defense is, "Any damages Amegy has suffered on its common law tort claims of conversion, aiding and abetting and conspiracy claims are barred and/or any limited by its own contributory negligence and comparative

fault pursuant to N.Y.C.P.L.R. Art. 14-A (including CPLR 1411) and/or Tex. Civ. Prac. & Rem. Code Ch. 33." (Doc. #69, at 15). Pursuant to this Court's choice of law determinations this affirmative defense is now moot. Therefore, this nineteenth affirmative defense is due to be denied.

x.     *Defendants can be Subjected to the Securities Agreement*

Deutsche Bank's twentieth affirmative defense is, "Amegy's claim for a declaratory judgment seeking to enforce its Security Agreement with Johnson against Defendants is barred because Defendants are not parties to or beneficiaries of that agreement." (Doc. #69, at 15). Amegy argues Section 9.201(a) of the UCC is clear that a "security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors." In response, Deutsche Bank continues to argue Deutsche Bank was innocent and therefore, the "otherwise provided" language within Section 9.201(a) of the UCC protects it from a declaratory action.

The Court finds that a security agreement can be brought against a creditor. UCC § 9-201(a); Tex. Bus. & Com. Code § 9.201(a) (2011). There could be a possibility that an exception applies. CNH Capital America LLC v. Progreso Materials Ltd., M-10-478, 2012 WL 5305697 at *5 (S.D. Tx. Oct. 25, 2012) (citing Tex. Bus. & Com. Code § 9.317). The Court is without benefit of the Parties arguments and citation to the record to eliminate this defense. Accordingly, the Court finds the twentieth affirmative defense is due to stand.

xi.     *Attorney Entitlement and Fees will be Determined Later (if applicable)*

The Court will defer whether attorney's fees are applicable in this case at the conclusion of the matter.

### C. **Motions for Summary Judgment**

Amegy filed a Motion for Final Summary Judgment on October 15, 2013. ([Doc. #65](#)). Deutsche Bank responded with their own Motion for Summary Judgment and Memorandum in Opposition on November 4, 2013. ([Doc. #75](#)). Deutsche Bank also filed a counter-statement of facts, ([Doc. #76](#)), in which Amegy filed a response, ([Doc. #94](#)). In addition, Amegy filed a response to Deutsche Bank's Motion for Summary Judgment on November 18, 2013. ([Doc. #95](#)). The motions are now ripe for review.

### i.   *Declaratory Judgment*

Deutsche Bank contends the declaratory judgment action is moot because Deutsche Bank no longer has any interest in the Spyglass Property, in which Johnson invested in. Deutsche Bank contends this Court does not have jurisdiction to enforce the security agreement between Amegy and Johnson against Deutsche Bank because they are a non-party to the contract.

The Court does not find Amegy's declaratory judgment matter to be moot. The fact that Deutsche Bank may no longer be involved in the Spyglass Property does not negate the underlying issue that Deutsche Bank possibly assisted Johnson in breaching the security agreement. In addition, and as previously stated, a security agreement can be brought against a creditor. Therefore, Deutsche Bank's argument is invalid here.

### ii.   *Conversion*

Amegy argues it is entitled to summary judgment with regard to its conversion claim. Specifically, Amegy argues it has perfected its security interest in the collateral, here the Partnership Units, the Host Stock, and the proceeds. Amegy argues Johnson was in default on his loan and security agreement with Amegy, and therefore Amegy had

the present right to possession of the relevant stock certificate. Amegy argue Deutsche Bank, through Rhodes, exercised control over the collateral, specifically the Host Stock, which resulted in the loss of money that would have otherwise provided repayment for Amegy's loan for Johnson. Therefore, Amegy contends it is entitled to summary judgment on its conversion claim in the amount of $9,516,052.12, the undisputed value of the stock certificate when Deutsche Bank exercised the unauthorized control, in addition to reasonable attorney's fees and interest.

In response, Deutsche Bank simply argues that no defendant wrongfully exercised control over the Host Stock, and therefore Amegy's "conversion" claims against both defendants are precluded. The Court finds Deutsche Bank's argument to be ineffective. The record shows Rhodes did have control over the relevant Host Stock. Deutsche Bank obtained the Host Stock certificate in Georgia. (Doc. #73-12, at 23). The Host Stock was sold and the proceeds were wired to Rhodes and Abbott. (Doc. #73-18; Doc. #73-19; Doc. #73-32; Doc. #73-33). Therefore, Deutsche Bank did take control over the Host Stock.

Moreover, suits for conversion are based upon an unauthorized exercise of dominion over the property of another. Bel-Bel Intern, Corp. v. Community Bank of Homestead, 162 F.3d 1101, 1108 (11th Cir. 1998) (citing Seymour v. Adams, 638 So.2d 1044, 1046-47 (Fla 5th DCA 1994); Harrell v. Anderson, 294 F.Supp. 405, 407 (S.D. Ga. 1968) (citation omitted). Amegy had the right to the Host Stock and Deutsche Bank exercised control over the Host Stock. The exercise of control was wrongful because the Host Stock was pledged to Amegy. Bel-Bel Intern, 162 F.3d at 1008. Johnson and Deutsche Bank did not have a right to take control of the Host Stock without Amegy's

consent. Id. The exercise of control was also to the determent of Amegy, which lost the money that would have otherwise provided repayment for the loan. Id. Therefore, Amegy has a strong, but not clear, claim for conversion. Id.  This is because the UCC provides broad protections for transferees of money so long as the transferee has not acted in collusion with the debtor. Therefore, again, this claim hinges on whether Defendants acted collusively with Johnson. Amegy is therefore not entitled to summary judgment on this issue.

### iii.    Aiding and Abetting

Deutsche Bank argues it is entitled to summary judgment on the aiding and abetting fraud claim because Georgia law does not recognize such a claim. Defendants rely on two cases. See Hays v. Paul, Hastings, Janofsky & Walker LLP, No. Civ.A. 106CV754-CAP, 2006 WL 4448809, at *8 (N.D. Ga. Sept. 14, 2006); BMC-The Benchmark Mgmt. Co. v. Ceebraid-Signal Corp., No. 1:05-cv-1149-WSD, 2007 WL 2126272, at *11 (N.D. Ga. July 23, 2007). In response, Amegy contends Georgia does recognize an aiding and abetting fraud claim. Amegy relies on one case. In re Friedman's Inc., 385 B.R. 381, 431 (S.D. Ga. 2008).

Upon review of these cases, the Court agrees with Deutsche Bank. This Court respectfully declines to follow In re Friedman's Inc. because this court did not cite to any case within the State of Georgia where a Georgia court recognized a tort claim for aiding and abetting fraud. In addition, Amegy has failed to cite to a Georgia court that explicitly recognizes the existence of such a claim. Accordingly, like the Hays and BMC cases, this court will not create a cause of action not recognized by the Georgia courts. See BMC, 2007 WL 2126272, at *11 ("Because no Georgia court has explicitly recognized a tort of

aiding and abetting fraud, the Court will not do so now.") (citing Hays, 2006 WL 4448809, at *8 (refusing to recognize a cause of action for aiding and abetting fraud through O.C.G.A. § 51-12-30 because Georgia courts have failed to explicitly do so)). In addition, unlike In re Friedman's Inc. which believed aiding and abetting fraud claims are essentially the same as aiding and abetting breach of fiduciary duty claims, here Amegy has not alleged Johnson had a fiduciary duty to Amegy and that Deutsche Bank assisted Johnson in breaching his fiduciary obligations to Amegy. In re Friedman's Inc., 385 B.R. at 431; cf Levine v. Suntrust Robinson Humphrey, 321 Ga.App. 268, 274 (2013) (briefly discussing that the claims for aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and conspiracy were similar). Here, and unlike In re Friedman's Inc., the underlying issue seems to be conspiracy which has been alleged in a separate cause of action. Therefore, the Court finds this claim cannot stand and is due to be denied.

### iv. Conspiracy

Deutsche Bank contends this claim should be dismissed. Deutsche Bank contends the claim would not move forward after a motion to dismiss stage. In addition, Deutsche Bank specifically argues Amegy does not allege anyone at Deutsche Bank agreed with Johnson or Martin to help dispose of Amegy's collateral in violation of Amegy's interest. Deutsche Bank also assert there are no facts to suggest such an agreement. In response, Amegy asserts the same facts giving rise to collusion would raise a factual question for the jury on the conspiracy claim as well.

Deutsche Bank's arguments are unavailing. The Third Amended Complaint specifically alleges,

> Johnson and his agents (including Pam Martin) and Defendants conspired to do an unlawful act in disposing of Amegy's collateral in direct violation of

> the Security Agreement and concomitant Financing Statement. Defendants' conduct in opening the accounts and disposing of Amegy's collateral in the manner they did was an overt act in pursuance of the conspiracy, which resulted in damages to Amegy in an amount equal to $9,516,052.12.

(Doc. #60, at 14). This claim is sufficient to state a cause of action for conspiracy. Amegy was not required to use the term "agreed" to establish a conspiracy cause of action. The alleged facts are set out within the claim specifically enough to move this count forward. Moreover, Deutsche Bank points to nothing on the record to rid this claim on summary judgment now.

       *v.*     *Alex.Brown is not entitled to Summary Judgment Under UCC Article 8*

Deutsche Bank asserts it is entitled to summary judgment under UCC Article 8, however, Deutsche Bank also recognizes that if it acted collusively then this argument would be without merit. The Court has already addressed that whether Deutsche Bank, including Deutsche Bank Alex.Brown specifically, acted collusively is a factual question. There is circumstantial evidence that may show that Deutsche Bank did act collusively. Therefore, Deutsche Bank is not entitled to summary judgment on this issue.

       *vi.*     *Punitive Damages*

Deutsche Bank asserts punitive damages are not available in this matter. In response, Amegy contends punitive damages are available with regard to its conversion claim. In Georgia, punitive damages are available for tort claims such as conversion where they are proven and the statutory requirements have been satisfied for such damages. Taylor v. Powertel, Inc., 250 Ga.App. 356, 357 (2001) (citing OCGA § 51-12-5.1). Further, "there must exist some evidence of culpable tortious conduct, and such culpable conduct must be of such nature to justify the imposition of punitive damages to penalize, punish, or deter such conduct." Taylor, 250 Ga.App. at 357 (citing Unified Svcs.

v. Home Ins. Co., 218 Ga.App. 85, 87-89(4) (1995)). This tortious conduct must be more than negligence. Taylor, 250 Ga.App. at 357 (citing Coker v. Culter, 208 Ga.App. 651, 652 (1993)). In reviewing the evidence, such as but not limited to the emails between Deutsche Bank and Johnson, the Court finds that there is a dispute as to whether Deutsche Bank acted with tortious conduct that could rise to the level of punitive damages. Accordingly, it is within the discretion of the jury to award punitive damages within this case.

Accordingly, it is now

**ORDERED:**

1. Amegy's Motion for Partial Summary Judgment on Deutsche Bank's Affirmative Defenses (Doc. #73) is **GRANTED in part** and **DENIED in part**.

   a. The motion is granted with regard to Deutsche Bank's second (Doc. #69, at 10), tenth (Doc. #69, at 13), fourteenth (Doc. #69, at 14), fifteenth (Doc. #69, at 14), nineteenth (Doc. #69, at 15), and twenty-first (Doc. #69, at 15) affirmative defenses.

   b. Deutsche Bank's sixteenth affirmative defense (Doc. #69, at 14) is **DENIED in part** in that Amegy's tort claims are not barred by collateral sources but **GRANTED in part** in that Amegy's tort claims could be limited.

   c. The motion is **DENIED** in all other respect.

2. Amegy's Motion for Final Summary Judgment (Doc. #65) is **DENIED**.

3. Deutsche Bank's Motion for Summary Judgment (Doc. #75) is **GRANTED in part** and **DENIED in part**.

      a. The motion is **GRANTED** with regard to Amegy's claim for aiding and abetting (Doc. #60, at 14).

      b. The motion is **DENIED** in all other respects.

4. Deutsche Bank's Motion for Leave to Designate Responsible Third Parties under Texas Law (Doc. #113) is **DENIED as moot**.

**DONE** and **ORDERED** in Fort Myers, Florida this 24th day of February, 2014.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record